## Dwight's Estate

Before Van Dusen, P. J., Sinkler, Klein, Bolger, Ladner and Hunter, JJ.

*W. Wilson White* and *Charles Morris Hamilton*, for exceptants.

*John W. McPherson*, contra.

KLEIN, J., June 28, 1946.—This case is another milestone in the interminable struggle between life tenants and remaindermen in their ceaseless efforts to obtain greater advantages for themselves in trust estates. The courts in Pennsylvania have, in the past, consistently held that principal is not to be depleted to aid necessitous life tenants and have always refused

to apportion the proceeds of the sale of unproductive real estate forming part of a decedent's estate for this purpose: Hubley's Estate, 16 Phila. 327 (affirmed by Supreme Court, January term, 1884, no. 355) ; Conner's Estate, 239 Pa. 449 (1913) ; Ferree's Estate, Orphans' Court, Philadelphia County, October term, 1928, no. 3045; Mark's Estate, 38 D. & C. 489 (1940). See also dissenting opinion of Stearne, J., in Levy's Estate, 34 D. & C. 312 (1938), adopted by the Supreme Court, 333 Pa. 440 (1939).

This rule of law has been changed in this State with the passage by our legislature of the Uniform Principal and Income Act of May 3, 1945, P. L. 416. Section 11 of that act provides:

"Unproductive Estate.—(1) Where any part of a principal in the possession of a trustee consists of realty or personalty which for more than a year and until disposed of as hereinafter stated has not produced an average net income of at least one per centum per annum of its fair inventory value or in default thereof its market value at the time the principal was established or of its cost where purchased later, *and the trustee is under a duty to change the form of the investment as soon as it may be done without sacrifice of value* and such change is delayed, but is made before the principal is finally distributed, then the tenant, or in case of his death his personal representative, shall be entitled to share in the net proceeds received from the property as delayed income to the extent hereinafter stated." (Italics supplied).

The enactment of this statute has created many new and complex problems.

E. Waterman Dwight, testator in the present case, died on March 7, 1934, leaving as one of the principal assets of his estate a large tract of land in an exclusive section of Chestnut Hill, overlooking Whitemarsh Valley. Testator had, himself, laid out the tract into residential building sites. He had imposed severe

building restrictions on part of the tract, prohibiting, inter alia, the construction of homes at a cost of less than $35,000. Decedent built a road through a portion of this tract and had, in fact, sold several lots prior to his death. It was necessary, however, for the trustees to complete the road in order to make other lots available for sale.

Four sales of lots were made by the trustees between November 14, 1939, and September 4, 1941. Another sale was consummated on May 3, 1945, the very day upon which the Uniform Principal and Income Act went into effect.

Counsel for the beneficiaries of the income of the trust of testator's residuary estate, of which this tract is the principal asset, contend that the proceeds of the sale of all these lots must be apportioned in accordance with the formula prescribed in section 11 of the act. The guardian and trustee ad litem vigorously opposed the claim for apportionment. He contended (1) that the act was unconstitutional; (2) that it cannot be applied retroactively; and (3) that, under the language of testator's will, the trustee "was not under a duty to change the form of investment as soon as it may be done without sacrifice of value."

The learned auditing judge, in a well considered and scholarly opinion, held that it was not necessary, under the circumstances of this case, to pass upon the question of the constitutionality of the act and that the act did not apply to sales made prior to May 3, 1945. He also concluded that the broad powers of retention given the trustees took this case out of the provisions of section 11 of the act.

There may be some doubt as to the constitutionality of the provision of the statute requiring an apportionment of corpus of unproductive assets forming part of estates created prior to May 3, 1945, the effective date of the act. We concur, however, with the learned auditing judge in his conclusion that it is not necessary

for us to pass upon the constitutional question at this time, because we agree that, under all the facts of the case, the trustees were not "under a duty to change the form of the investment", as required by section 11. We are also in full agreement with his views that the provisions of the section in question do not apply to sales made prior to the effective date of the act.

The act does not attempt to explain what is meant by the phrase "Where . . . the trustee is under a duty to change the form of the investment as soon as it may be done without sacrifice of value, . . ." Trustees without authority to invest in or to retain nonlegal investments would clearly be under a duty to sell as soon as the assets could be sold without sacrifice. This would also be true where such trustees receive a nonlegal investment as part of a salvage operation on a defaulted investment; the usual cases being those in which trustees bought in real estate in foreclosure proceedings upon defaulted mortgages held by estates. The trustees would also be under a duty to sell if the will or other instrument creating the trust contained specific directions ordering the trustees to dispose of a specific asset or type of assets or to convert the estate into a designated form of investment. Since the trustees are bound in all cases to deal impartially with life tenants and remaindermen, they would in some cases, too, by reason of the existing circumstances, be impliedly under a duty to sell unproductive assets in order to make the estate productive.

In the present case the trustees are authorized "to retain" unproductive trust property "for any length of time they may deem expedient" and "to sell" such property "at such time, for such price and upon such terms . . . as they may think best." In view of this broad power of retention granted to the trustees, the question of determining whether they were under an implied duty to sell the vacant land depends upon the

provisions of the will studied in the light of the attending circumstances.

Section 240 of A. L. I. Restatement of the Law of Trusts states in comment g:

"Where by the terms of the trust there is a general authorization to retain trust property included in the trust at the time of its creation, it is a question of interpretation whether such authorization permits the trustee to retain unproductive property. Such a general authorization may be interpreted merely to permit the trustee to retain investments which would not otherwise be proper trust investments because of their hazardous character, and not to permit the trustee to retain such property as yields no income. On the other hand, it may be interpreted to permit the retention of investments without regard to the ordinary requirement that the trust property shall be so invested as to yield a fair income."

It is common knowledge that for some years prior to 1934, the year in which testator died, the country was engulfed in a great economic depression. The sale of real estate was practically at a standstill. Thousands of citizens had lost their homes through foreclosures and real estate values were depreciated to a point where it was almost impossible to dispose of property except at tremendous sacrifice. Building construction was in the doldrums and large residential properties were a drug on the market. Under these circumstances, trustees could not have been expected to dispose of this expensive building development, except slowly over a long period of years. Even more important are the facts mentioned earlier in connection with testator as the original promoter of this development. This tract of ground was his most valuable single asset and constituted a substantial portion of his estate. He must have known that the completion of the development and the sale of these restricted building lots, at fair and reasonable prices, would be

a long process, requiring patience and skill on the part of the trustees, during which period there would be little or no income therefrom.

Testator in the present case was a bachelor whose closest living relative was apparently a niece, Camilla Ross Austin. This niece was clearly his favored income beneficiary, because he first provided for the creation of a trust fund of $200,000 for her benefit, with remainder at her death to her issue. Exceptants, who are entitled to monthly payments of $1,000 each from the income derived from the residue of the estate, after the creation of the $200,000 trust for testator's niece, are both unrelated to testator. The remainder interest in said trust of the residue goes to the descendants of certain grandnieces of testator and, if there should be no such descendants, to the remaindermen of the $200,000 trust. This is, therefore, not a case in which it can be urged that testator contemplated a prompt sale of unproductive realty in order to provide necessary income for members of his own family. Furthermore, it is clear that if this land had been sold shortly after testator's death the prices which could have been realized would not have been sufficient to create a fund ample to produce the income necessary to pay the exceptants $1,000 each monthly. On the other hand, with the present sharp rise in real estate values, sufficient principal may be obtained to enable exceptants to receive the stipulated income in full.

In view of all of these facts and the clear language of the will authorizing the retention of this asset, we are of the opinion that trustees were not under a duty to sell this land and thus bring the proceeds within the purview of section 11 of the Uniform Principal and Income Act for apportionment. This conclusion applies with equal force to the sales made prior to May 3, 1945, the effective date of the act, as well as to the one sale consummated on that day.

We purposely refrain from expressing any opinion with respect to the effect of the previous adjudications

on the rights of exceptants, as in our opinion such discussion is not necessary in view of our conclusion that trustees were not under a duty to dispose of the unproductive land in question.

The exceptions are therefore all dismissed and the adjudication is confirmed absolutely.